**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

        **Plaintiff,**

    v.                                **Civil Action No. 4:17cv113**

HUNTINGTON INGALLS, INC.,

        **Defendant.**

## <u>OPINION & ORDER</u>

This matter is before the Court on Defendant, Huntington Ingalls, Inc.'s ("Defendant's" or "the Shipyard's") Motion for Summary Judgment. Doc. 23 ("MSJ"). This matter also comes before the Court on the Equal Employment Opportunity Commission's ("Plaintiff's" or "EEOC's") Motion to Strike Defendant's Expert Witnesses ("Motion to Strike"), Doc. 32. A hearing on these matters was held on October 31, 2018. For the reasons stated below, the Court **DENIES** Plaintiff's Motion to Strike and **GRANTS** Defendant's Motion for Summary Judgment.

## I.    FACTUAL AND PROCEDURAL HISTORY

On September 13, 2017, the EEOC filed its complaint against the Shipyard alleging that the Shipyard violated § 102 of the Americans with Disabilities Act. Doc. 1 ("Compl."). In 2013, Stanley Dowdle ("Dowdle") applied to work for the Shipyard as a temporary leased laborer in the position of "pipefitter." Id. After applying, Dowdle was offered conditional employment pending his completion of a post-offer medical examination, which included a hearing test. Doc. 24 at 7-8; Doc. 24-4 ("Dowdle Dep.") at 7. Dowdle suffers from hearing loss, and wears hearing aids on a daily basis to assist him in hearing. Compl. ¶13. At the hearing test, Dowdle asked for

1

the ability to use his hearing aids, but was advised that he had to perform the test without his hearing aids. Doc. 24 at 9; Dowdle Dep. at 52, 55. After reviewing Dowdle's hearing test results, the Shipyard denied Dowdle employment as a leased laborer, advising that Dowdle's hearing fell below the minimum hearing standard. Doc. 24 at 9; Doc. 24-9 ("Denial E-mail").

On January 16, 2018, this Court entered a 16(b) scheduling order ("Scheduling Order"), which required the parties to identify expert witnesses who will provide potential Rule 702, 703, or 705 evidence by July 6, 2018. Doc. 8. The Scheduling Order also required disclosures outlined in Rule 26(a)(2)(B) ("expert reports") to be made on August 6, 2018. Id. On July 6, 2018, Defendant provided its expert witness disclosure identifying three potential expert witnesses: Hellen Dennie ("Dennie"), Kent Shoemaker ("Shoemaker"), and Drucilla Branche ("Branche"). Doc. 30 at 3. On August 6, 2018, Defendant failed to provide an expert report for any of the potential expert witnesses. Doc. 30 at 4. On August 15, 2018, Plaintiff contacted Defendant to determine whether Defendant intended to provide an expert report for any of its identified experts. Doc. 30 at 3. Defendant responded by providing an amended disclosure for Dennie and Branche. Doc. 30 at 4; See Doc. 30-5 ("Am. Discl."). The amended disclosure contained the following summaries regarding Dennie and Branche's testimonies:

> [Dennie] [m]ay provide expert testimony regarding Defendant's hearing test requirements, hearing conservation program, and minimum hearing requirements as job related and consistent with business necessity; may provide expert testimony regarding Dowdle as a direct threat of harm to himself and/or others; may provide expert testimony regarding the inexistence of a reasonable accommodation for Dowdle's hearing loss.

> [Branche] [m]ay provide expert testimony regarding minimum hearing requirements as job related and consistent with business necessity; may provide expert testimony regarding Dowdle as a direct threat of harm to himself and/or others; may provide expert testimony regarding the safety hazards of accommodations in the shipyard for workers with hearing loss.

Doc. 30 at 4-5; Am. Discl. at 2-3.

On September 28, 2018, Defendant filed its Motion for Summary Judgment. Doc. 23. On October 11, 2018, Plaintiff filed its opposition to Defendant's Motion for Summary Judgement. Doc. 31. On October 12, 2018, Plaintiff filed a Motion to Strike the testimony of Branche and Dennie. Doc. 32. On October 18, 2018, Defendant filed a reply in support of its Motion for Summary Judgment. Doc. 37. On October 24, 2018, Defendant filed a Motion in Limine. Doc. 38. On October 25, 2018, Defendant filed its opposition to Plaintiff's Motion to Strike. Doc. 40. On October 30, 2018, Plaintiff filed a reply in support of its Motion to Strike. Doc. 44. Both Plaintiff's Motion to Strike and Defendant's Motion for Summary Judgment are now ripe for review.

## III.    LEGAL STANDARDS

### A.    Motion to Strike

Federal Rule of Civil Procedure 37(c) provides that "if a party fails to provide information…as required by Rule 26(a) . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1).  Under Fourth Circuit precedent:

> In exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

S. States Rack And Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003).

### B.    Motion for Summary Judgment

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that no genuine

issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50 (1986); Terry's Floor Fashions v. Burlington Indus., 763 F.2d 604, 610 (4th Cir. 1985). Once a party has properly filed a motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings but must instead set forth specific facts illustrating genuine issues for trial. Celotex, 477 U.S. at 322–24. Such facts must be presented in the form of exhibits and sworn affidavits. Failure to rebut the motion with such evidence will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

A mere scintilla of evidence is insufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the factfinder reasonably could find for the nonmoving party. See Anderson, 477 U.S. at 252. Although the court must draw all justifiable inferences in favor of the nonmoving party, in order to successfully defeat a motion for summary judgment, a nonmoving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." Doyle v. Sentry Ins., 877 F. Supp. 1002, 1005 (E.D. Va. 1995) (citing Celotex, 477 U.S. at 324).

## IV. ANALYSIS

### A. Motion to Strike

Plaintiff argues that the testimony of Defendant's witnesses Dennie and Branche should be excluded because Defendant did not provide the disclosures required under Federal Rules of Civil Procedure 26(a)(2)(B) and 26(a)(2)(C). Doc. 30 at 1. For the reasons stated below, the

Court **FINDS** that Defendant was not required to provide an expert report under Rule 26(a)(2)(B), that the disclosures provided by Defendant were adequate under Rule 26(a)(2)(C), and, even if Defendant's expert disclosures were deficient, such deficiencies were cured when Defendant made its experts available for deposition well in advance of trial.

Federal Rule of Civil Procedure 26(a)(2)(A) requires a party to disclose the identity of any witness it may use at trial to present evidence under Federal Rules of Civil Procedure 702, 703, and 705 ("expert testimony"). Fed. R. Civ. P. 26(a)(2)(A). When an expert witness is "one retained or specially employed to provide expert testimony in the case or whose duties as the party's employee regularly involve giving expert testimony" the disclosing party must additionally provide an expert report for the expert witness. Fed. R. Civ. P. 26(a)(2)(B). The report must contain:

> **(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;
> **(ii)** the facts or data considered by the witness in forming them;
> **(iii)** any exhibits that will be used to summarize or support them;
> **(iv)** the witness's qualifications, including a list of all publications authored in the previous 10 years;
> **(v)** a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> **(vi)** a statement of the compensation to be paid for the study and testimony in the case.

Id. If a witness is not required to provide an expert report, the witness must nevertheless provide a disclosure of the subject matter on which the witness is expected to present expert evidence and "a summary of the facts and opinions to which the witness is expected to testify." Id. Therefore, to determine whether an expert report is required under Rule 26(a)(2)(B) or Rule 26(a)(2)(C), the Court must determine first whether the witness testifying is offering expert testimony. If the witness is offering expert testimony, then the Court must secondarily determine whether an expert report under Rule 26(a)(2)(B) or a summary of facts and opinions under 26(a)(2)(C) is

5

required. Thirdly, the Court must determine whether the disclosures provided meet the standards set forth in Rules 26(a)(2)(B) and 26(a)(2)(C).

Plaintiff complains that the deposition testimony of Defendant's experts Dennie and Branche "stray[s] well beyond the realm of a Rule 26(a)(2)(C) witness." Doc. 30 at 5. Therefore, Plaintiff contends that it should have been provided with an expert report for Dennie and Branche. Defendant argues that, even assuming arguendo that Dennie and Branche proffer "expert testimony" Defendant was not required to provide expert reports for Dennie or Branche, because they were not "retained or specially employed" for the purpose of litigation. Doc. 40 at 9-10, n. 6 (citing Va. Elec. & Power Co. v. Sun Shipbldg. & Dry Dock Co., 68 F.R.D. 397, 407-08 (E.D. Va. 1975) (distinguishing between an expert employed for purposes of the specific litigation as opposed to an employee who "though [he] be an expert. . . his contact with the case is not in his capacity as an impartial observer, but is instead as one going about his duties as a loyal employee.")).

Dennie is Defendant's 30(b)(6) witness who was designated to offer testimony regarding the Shipyard's minimum hearing standard. Doc. 40 at 4. Dennie testified that she had personal knowledge that the minimum hearing standard was in effect at the time that Dowdle was denied employment. Id; see Doc. 40-1 ("Dennie 30(b)(6) Dep.") at 5-6. Defendant contends that Dennie makes her expert opinions based on her knowledge from working at the Shipyard and dealing with the hearing of employees at the Shipyard, including those who perform pipefitting work. Doc. 40 at 7-8.

Likewise, Defendant contends that Branche based her expert opinion regarding the minimum hearing requirements and their relation to the safety and health of employees on over 25 years of employment with the Shipyard, her personal interaction with the Shipyard's hearing

conservation program, her personal knowledge of the pipefitter position, and her personal experience designating high noise environments. Id. at 5-6; See Doc. 40-2 ("Branche Dep.").

Based on Dennie and Branche's personal experience with the health and safety standards of the shipyard and the hearing requirements, Defendant contends that 26(a)(2)(B) expert reports were not required. Further, Defendant argues that the disclosures that it provided to Plaintiff meet the requirements of 26(a)(2)(C).

In reply, Plaintiff argues that Defendant's experts should have provided expert reports because neither of the experts personally examined Dowdle. Therefore, their opinions are based, in part, on hypotheticals regarding a person with Dowdle's level of hearing impairment and not based on their personal observations or treatment of Dowdle's hearing. Doc. 44 at 4. Plaintiff also argues that the disclosures provided by Defendant were inadequate to satisfy Rule 26(a)(2)(C).

The Court **FINDS** that expert reports under Rule 26(a)(2)(B) were not required given the nature of Dennie and Branche's testimony. Neither Dennie nor Branche were retained or specially employed by Defendant to testify regarding matters related to the litigation. Both Dennie and Branche are employed with Newport News Shipbuilding and are familiar with the minimum hearing standards through their employment with Newport News Shipbuilding. Although Dennie was not employed at the time that Dowdle's application was rejected, Dennie became aware of the minimum hearing standard through her employment at Newport News Shipbuilding and was even involved in revising that standard after she became employed with Newport News Shipbuilding.

Similarly, Branche based her testimony about the nature of the noise environments at Newport News Shipbuilding on her personal experience working in health and safety at Newport

News Shipbuilding. Therefore, Defendant was not required to provide expert reports for Dennie and Branche.

Upon review of the disclosures provided by Defendant, the Court also **FINDS** that Defendant's disclosures are sufficient to satisfy Rule 26(a)(2)(C). Defendant adequately summarized Dennie and Branche's testimony in a manner that would have allowed Plaintiff to prepare its discovery and any rebuttal experts accordingly. Further, even if an expert report was required under Rule 26(a)(2)(B) or the Rule 26(b)(2)(C) disclosures were deficient, the Court would not exclude the testimony of Dennie and Branche, because any such failure was harmless as it was cured by Plaintiff's thorough deposition of Dennie and Branche, which was obtained more than a month before trial. Therefore, for the reasons explained above, the Court **DENIES** Plaintiff's Motion to Strike.

## B.     Motion for Summary Judgment

Plaintiff alleges that Defendant discriminated against Dowdle based on his hearing disability in two ways: (1) by failing to hire Dowdle when Dowdle was qualified to work as a pipefitter; and (2) by failing to accommodate Dowdle by not allowing him to use his hearing aids during the hearing test. Compl. ¶¶ 26-52. The Shipyard argues that this Court should grant its motion for summary judgment for four reasons: (1) the Shipyard was not Dowdle's employer; (2) the EEOC cannot establish the elements of its failure to hire and failure to accommodate claims; (3) the Shipyard's hearing standards are job-related and consistent with business necessity; and (4) Dowdle would have constituted a direct threat of harm to himself and others. Doc. 24 at 6. For the reasons stated below, the Court **FINDS** that Defendant would have been considered Dowdle's employer for purposes of the ADA, but the Court also **FINDS** that Plaintiff

has failed to establish the elements of its failure to hire and failure to accommodate claims. Therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment.

## i.    *Factual Background*

Defendant enters into contracts with third-party employers, such as Caliper, Inc. ("Caliper" or "Supplier"), to provide Defendant with leased laborers for the Newport News Shipyard. Doc. 24 at 7; Doc. 24-1 (Contract). The Shipyard is a very fluid environment that is constantly undergoing construction. Doc. 24 at 10. As such, the Shipyard regularly utilizes a variety of safety alarms, including emergency alarms such as fire alarms, and toxic gas alarms, as well as alarms from specific pieces of equipment, including cranes, trucks, and forklifts, on a regular basis. Doc. 24 at 8. In particular, the sirens for particular pieces of equipment generally sound at a level of 50dB or 55dB at frequencies between 1000Hz and 2000Hz[1], the intensity of which lessens as a person is farther away from the direct source of the siren. Doc. 24 at 8; Doc. 24-7 at 6-7. In addition to the sound of alarms and sirens, at any given moment employees may be required to respond to verbal communications that sound over speaker systems as well as verbal warnings from their fellow employees. Doc. 24 at 8; Doc. 24-2 at 11-12; Doc. 24-5; Doc. 24-7 at 5-6.

Due to the many hazards and risks at the Shipyard, the Shipyard requires that both its direct employees and leased laborers have the "unaided aural acuity to hear and respond to audible alarms for personal safety and the safety of others." Doc. 24 at 8; see Docs. 24-5, 31-7 ("Minimum Hearing Standards"). While candidates for direct employment with the Shipyard

---

[1] A "decibel" or "dB" is a unit used to measure the intensity of a sound, or in other terms, the loudness of the sound. Doc. 28 at 4, n. 2. The sound's "frequency" or "Hertz (Hz)" describes the number of waves that pass a fixed place in a given amount of time. This is commonly referred to as the pitch of the sound. Doc. 28 at 4, n. 3.

("direct employees") have their hearing exam performed by the Shipyard, leased laborers obtain outside hearing exams and those exams are then provided to the Shipyard for review. Doc. 24-5. In 2013, the Shipyard utilized a minimum hearing standard of 100dB at frequencies of 500Hz, 1000Hz, 2000Hz, and 3000Hz.[2] Doc. 24 at 9. In 2014, this standard was raised to 160dB at frequencies of 3000Hz, 4000Hz, 6000Hz, and 8000Hz. Id. While the 2014 standard is in writing, the standard that was in place in 2013 was only communicated orally.[3] Doc. 31-1 at 50.

One of the positions at the Shipyard is that of a pipefitter. Pipefitters often work in close proximity to various other types of employees, such as welders, machinists, and metal mechanics, and their work environment is constantly changing. Doc. 24 at 10; Doc. 24-2. Pipefitters also utilize tools, such as grinders, to perform their work, and pipefitters regularly, but do not always, work in or around "high noise"[4] environments. Ex. 24-2 at 21-23. In such environments, the Occupational Health and Safety Administration ("OSHA") requires employers to administer a "hearing conservation program" to ensure that employees wear personal protective equipment to protect their hearing from further damage. Doc. 24 at 11, n. 6; See 29 C.F.R. § 1910.95. In regard to wearing hearing aids in high noise environments, OSHA guidance provides:

> Some hearing-impaired workers who wear hearing aids want to be able to continue to wear hearing aids in their workplaces even when exposed to high levels of noise. They feel that with the hearing aid they can communicate better with co-workers, are able to better localize sound, and can hear warning or equipment sounds. Hearing aids, however, in addition to amplifying sounds also amplify unwanted background noise [4]. As demonstrated in both laboratory and site measurements, noise amplified by hearing aids may exceed the OSHA 8-hour permissible limit of 90 dBA . . . Consequently, hearing aids should not be worn in areas with hazardous noise.

[2] The standard evaluates the candidate's cumulative deficit at the four different frequencies, i.e., a candidate who could only hear a sound if it was greater than 25 dB at the four frequencies would have a cumulative (>25x4) deficit of greater than 100dB at the four frequencies. A higher cumulative deficit indicates poorer hearing.
[3] The Shipyard could not provide testimony as to when the standard was put in place, however it is undisputed that the 100dB standard was applied to evaluate Dowdle's hearing test in 2013. Doc. 31-1 at 26-29.
[4] The term "high noise" is used to refer to areas where noise exposure equals or exceeds an 8-hour time-weighted average sound level of 85 decibels. Doc. 24 at 11, n. 6.

Doc. 24-10 (2005 OSHA guidance) at 4. The OSHA guidance also provides that exceptions can be made for individuals to wear their hearing aids under their protective equipment; however, these cases are to be evaluated on a case-by-case basis and should be monitored by the hearing conservation professional to ensure no further change in hearing occurs. Id. Defendant's contract with Caliper placed on Caliper the responsibility to comply with "any and all applicable local, state and federal employment law requirements relating to its Contract Labor personnel," including the responsibility to comply with OSHA's hearing conservation plan for the leased laborers. Doc. 24-1 at 4; Doc. 24-6 at 22.

In 2013, Dowdle applied to work a as a pipefitter for Defendant through a temporary staffing agency, National Inspection & Consultants ("NIC"). Doc. 24 at 7. NIC referred Dowdle's application to Caliper, who in turn referred Dowdle to Defendant as a pipefitter candidate. Id. Dowdle, who has suffered from hearing loss since he was 18 years old, had previously worked as a pipefitter at Newport News Shipbuilding between 2002 and 2006. Doc. 24-6. However, since 2012, Dowdle has worn hearing aids in both ears. Doc. 24-4 at 4. His hearing aids assist him to better communicate with others. Id.

Before the preliminary hearing test was performed, Dowdle asked to use his hearing aids, but his request was denied. Doc. 24 at 8. The testing provider advised that the test was to evaluate Dowdle's unaided hearing. Doc. 24-4 at 8. Dowdle's unaided hearing results for his left ear were ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████ Doc. 28-1. For his right ear, Dowdle's results were ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████  Id. Thus, Dowdle's cumulative hearing loss for both ears greatly exceeded the minimum standards. Id. After Dowdle's hearing test results were reviewed by the Senior Safety Technician, she determined that Dowdle's hearing was too poor for Dowdle to be hired as a leased laborer pipefitter. Doc. 24 at 9. Dowdle attempted to make further contact with Defendant in order to be tested with his hearing aids or to be allowed to work as a pipefitter without his hearing aids, but his request was denied. Doc. 31-1 at 31; Doc. 31-6.

ii.    Whether the Shipyard was Dowdle's "Employer" Under the ADA

Defendant argues that it would not have been Dowdle's employer if Dowdle had been hired because, had Dowdle been hired, he solely would have been an employee of Caliper or NIC, but not Defendant. Doc. 24 at 15. Therefore, as no employer-employee relationship would have existed, Defendant contends that it cannot be held liable under the ADA. Id.

The ADA provides, in relevant part, that no "covered entity shall discriminate against a qualified individual on the basis of disability in regard to...hiring." 42 U.S.C. § 12112(a) (emphasis added). "A 'covered entity' means an employer, employment agency, labor organization or joint labor-management committee." 42 U.S.C. § 12111(2).

A person can have multiple or joint "employers."[5] Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 408 (4th Cir. 2015). "The basis for the finding that two companies are 'joint employers' is that 'one employer while contracting in good faith with an otherwise independent

---

[5] Both Plaintiff and Defendant rely on Butler, which examined whether an employee can have multiple employers or "joint employers" with regard to a discrimination claim under Title VII. The Fourth Circuit has yet to apply Butler within the context of an ADA case. However, the definition of "employer" under title VII is the same as under the ADA, therefore the same analysis would likely apply in this case. Compare Butler, 793 F.3d at 408 ( "Title VII of the Civil Rights Act of 1964 defines an 'employer' as a 'person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.' Id. (citing 42 U.S.C. § 2000e(b)) with 42 U.S.C.A. § 12111 (defining term "employer" under the ADA to mean "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person...").

company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.'" Id. To determine whether an individual would be jointly employed by two or more entities, the court examines the following factors:

> (1) authority to hire and fire the individual;
> (2) day-to-day supervision of the individual, including employee discipline;
> (3) whether the putative employer furnishes the equipment used and the place of work;
> (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
> (5) the length of time during which the individual has worked for the putative employer;
> (6) whether the putative employer provides the individual with formal or informal training;
> (7) whether the individual's duties are akin to a regular employee's duties;
> (8) whether the individual is assigned solely to the putative employer; and
> (9) whether the individual and putative employer intended to enter into an employment relationship.

Butler, 793 F.3d at 414. While none of the Butler factors are dispositive, the Fourth Circuit has indicated that the first, second, and third factors are the "most important." Id. at 414. However, Defendant urges the Court to focus primarily on factors four and nine of the nine factor test. Doc. 28 at 16.

In support of the ninth factor, dealing with the intent of the parties, Defendant highlights its labor agreement with Caliper, which provides:

> "[Caliper] including . . . its administrative employees and/or Contract Labor assigned to Huntington Ingalls, is not an employee . . . of Huntington Ingalls. Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between Huntington Ingalls and [Caliper], including its Contract Labor."

Doc. 28 at 16. In support of the fourth factor, which deals with the responsibility over records, Defendant highlights that Caliper has its own "hearing conservation program" for its employees. Doc. 28 at 17. This program, as required by OSHA, monitors whether significant hearing loss has occurred due to exposure to high noise environments. Id. Defendant argues that because

Caliper, and not Defendant, has access to Dowdle's medical records in regard to the "hearing conservation program" it is unable to perform one of the "key 'employer' functions for Caliper's leased employees." Id.

Plaintiff responds by highlighting the first three factors. Doc. 31 at 12. Plaintiff alleges that Defendant ultimately hires and fires the leased laborers provided by Caliper, that Defendant heavily supervises these leased laborers, and that a leased laborer's work for Defendant is performed at the shipyard, with Defendant's tools, and side-by-side with direct employees of Defendant. Doc. 31 at 13. Plaintiff also highlights that Defendant ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ Doc. 51 at 5 (citing Sealed Ex. C ("Caliper Contract"; Sealed Ex. D ("Purchase Order"); and Sealed Ex. E ("Temporary Leased Labor Management Policy")).

In support of the fourth factor, Plaintiff argues that portions of the contract demonstrate that Defendant was also ultimately in control of the records that Caliper maintained because Defendant required Caliper to maintain certain records under their contract. Doc. 31 at 13. Additionally, Plaintiff highlights a previous letter that Defendant wrote to the EEOC, which asserted:

> When a host employer supervises and controls the day-to-day work of a temporary employee...at its facility, OSHA considers the host employer...the temporary employee's

supervisor for OSHA purposes. OSHA holds the host employer responsible for the temporary employee's occupational health and safety while the temporary employee works at the host facility.

Doc. 31 at 14, n. 8 (citing Pl. Dep. Ex. 16).

Based on the contractual provisions cited by Plaintiff the Court **FINDS** that the evidence shows that Defendant would have been Dowdle's joint employer for purposes of liability under the ADA.

*vi.    Failure to Hire Claim*

"To establish a claim for disability discrimination under the ADA, a plaintiff must prove (1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability.'" Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 572 (4th Cir. 2015) (internal quotations omitted). When alleging disparate treatment, an employee can show discrimination by using direct or indirect evidence or the burden-shifting standard set forth in McDonell Douglas. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 572 (4th Cir. 2015) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Under the McDonnell Douglas burden-shifting framework, an employee must first establish a prima facie case of discrimination. 411 U.S. at 802. If the employee establishes a prima facie case of discrimination, then the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. Reeves v. Sanderson Plumbing Products, Inc. 530 U.S. 133, 142 (2000). Once the employer meets this burden, the presumption of discrimination "drops out of the picture" and an employee must show that the employer's explanations were not its true reasons for taking the employment action, but were a pretext for discrimination. Reeves, 530 U.S. at 143.

In Plaintiff's response to Defendant's Motion for Summary Judgment, Plaintiff chose to argue its failure to hire claim under the <u>McDonnell Douglas</u> framework. Doc. 31at 14. Defendant contends that Plaintiff cannot meet its burden under the <u>McDonell Douglas</u> framework because, even if Plaintiff can show prima facie evidence that Defendant discriminated against Dowdle, Plaintiff has not produced any evidence by which a trier of fact can conclude that Defendant's non-discriminatory reason for failing to hire Dowdle was pretextual. Doc. 37 at 15.

**b.      Prima Facie Evidence of Discrimination**

The ADA prohibits a covered entity from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. §12112(a). The term "qualified individual with disability" is defined as "an individual who, <u>with or without reasonable accommodation,</u> can perform <u>the essential functions </u>of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). Defendant contends that Plaintiff cannot establish that Dowdle is a "qualified individual" with a disability for the purpose of the ADA for two reasons: 1) because the ability to hear warning alarms and announcements, and communicate effectively with coworkers is an essential function of the pipefitter position and 2) with or without accommodation, Dowdle could not hear warning alarms and announcements or communicate effectively with coworkers.[6] Doc. 28 at 17.

*1.      Essential Functions of Pipefitter Position*

Essential job functions are those job functions that "bear more than a marginal relationship to the job at issue." <u>Tyndall v. National Educ. Centers, Inc. of California</u>, 31 F.3d 209, 213 (4th Cir. 1994). "In determining what job functions are essential "consideration shall

---

[6] For the purpose of the Motion for Summary Judgment, Defendant does not contest that Dowdle's hearing impairment is a disability. Defendant also concedes that it failed to hire Dowdle in light of his hearing impairment.

be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." Id. Other factors to consider include "[t]he amount of time spent on the job performing the function . . . [t]he consequences of not requiring the incumbent to perform the function . . . work experience of past incumbents in the job . . ." 29 C.F.R. § 1630.2.

Defendant contends that the undisputed facts demonstrate that the ability to hear warning alarms, to communicate effectively with coworkers, and to hear announcements are all essential functions of the pipefitter position. Doc. 28 at 19.

Plaintiff attempts to dispute the fact that "hearing" is an essential function of the pipefitter position by highlighting the fact that neither the job announcement nor the Defendant's job description announce a hearing requirement, an industrial hygienist testified that he had never seen the minimum audiometric requirement, the audiometric requirements only applied to leased laborers and not direct hires, Defendant no longer verifies the audiograms of leased laborer employees[7], and Defendant "makes no analysis and provides no support for its assertions that the ability to hear an alarm or announcement and communicate with co-workers are essential functions of the pipefitter position."[8] Doc. 31 at 17-18.

The Court **FINDS** that the facts cited by Plaintiff are insufficient to create a genuine dispute as to the material fact that the ability to hear alarms, announcements and communicate effectively with coworkers is essential to performing work as a pipefitter at the Shipyard.

---

[7] In the cited deposition testimony, the witness indicates that the Shipyard still requests audiograms, but they don't "review them at all . . . unless [they] are auditing them . . . the provider is supposed to have an audiogram for them." However, the witness also testified that she is not familiar with whether leased labor individuals have to have a minimum audiometric requirement.
[8] The testimony of Branche and Dennie supports Defendant's assertions that the ability to hear an alarm or announcement and communicate with co-workers are essential functions of the pipefitter position.

In regard to the fact that the job announcement does not "announce a hearing requirement", the Court notes that the exhibit cited by Plaintiff does indicate that the Leased Labor Provider Company is required to provide documentation for the leased labor candidate, including "medical clearances, etc." for review by the Health and Safety Department. Doc. 31-2. Further, it is undisputed that Dowdle's employment was conditioned upon his performance on the hearing exam.

Additionally, the Court notes that Plaintiff mischaracterizes the fact that the "audiometric requirement only applied to leased laborers and not direct hires." The record establishes that the audiometric requirement applied to both leased laborers and direct hires. As discussed at the hearing, the difference with regard to leased laborers and direct hires took place not in whether the audiometric requirement applied, but in how Defendant proceeded after determining that a candidate performed poorly on the hearing examination. A direct employee candidate's hearing exam was further reviewed, whereas a leased labor candidate's hearing exam was not further reviewed. As discussed above, the Shipyard's hearing conservation program covered direct employees, whereas the conservation of a leased laborer's hearing was not covered by the Shipyard. Therefore, while the Shipyard can determine whether a direct employee's hearing has worsened after working at the Shipyard, whether a leased laborer's hearing has worsened is evaluated by the Supplier. Furthermore, the fact that a direct employee candidate's hearing test is further reviewed would not guarantee that the direct employee would be allowed to perform shipboard work, as certain candidates' hearing would be too poor to perform shipboard work.[9]

---

[9] In Exhibit J to Plaintiff's Memorandum in Opposition, Plaintiff attaches a letter from 2014 where Defendant provided further information regarding its hearing unaided hearing exam requirement. See Doc. 31-10. In the letter, Defendant notes "Based on results, restrictions may be placed for an employee assigned to work in a production, noise monitored area. The restrictions placed will read 'no blasting, chipping or arcing'. If the loss is greater than a moderate loss, >60dB, an additional restriction of 'no shipboard work' will be placed." Doc. 31-10 at 2.

## 2.    *Reasonable Accommodation*

Plaintiff has the burden of proving that an accommodation exists, and that the accommodation is reasonable. Lamb v. Qualex, Inc., 33 Fed. App'x 49, 59 (4th Cir. 2002). If Plaintiff meets its burden, then the employer may present evidence that Plaintiff's requested accommodation imposes an undue hardship on the employer. Id.

Defendant claims that Dowdle is not able to accommodate his inability to hear using hearing aids because OSHA guidance warns that hearing aids, as amplification devices, should not be worn in high noise environments. Doc. 28 at 19, n. 12. Plaintiff points to the fact that not all environments where a pipefitter works are "necessarily" high noise environments, and proposes that it would have been reasonable for Dowdle to wear his hearing aid in a low noise environment. Doc. 31 at 10. However, based on the undisputed testimony that the Shipyard environment is constantly changing, that pipefitters may still be subjected to high noise activities by employees around them, and the fact that OSHA guidance warns about the potential dangers of hearing aids to amplify any background noise, the Court **FINDS** that it would not be a reasonable accommodation to for Defendant to attempt to confine Dowdle to low noise areas.

### b.    **Legitimate Nondiscriminatory Purpose and Evidence of Pretext**

More importantly, even if such an accommodation would be reasonable, Plaintiff's failure to hire claim fails because Plaintiff has not produced any evidence by which a trier of fact can conclude that Defendant's non-discriminatory reason for failing to hire Dowdle was pretextual.[10] Doc. 37 at 15. As a legitimate non-discriminatory reason for not permitting Mr. Dowdle to work as a pipefitter, Defendant has produced "the requirement that all workers have sufficient, unaided aural acuity." Doc. 37 at 13. Defendant contends that because this policy is

---

[10] Plaintiff failed to argue any pretextual basis for Defendant's minimum audiometric requirement in its responsive brief.

"neutral" and "generally applicable," Plaintiff cannot show that Defendant's decision to deny Dowdle's employment is motivated by an animus against his disability. Id (citing Raytheon Co. v. Hernandez, 540 U.S. 44, 54-55 (2003) (finding that an employer's proffer of "its neutral no-rehire policy plainly satisfied its obligation under . . . McDonnell Douglas to provide a legitimate, nondiscriminatory reason")).

Defendant argues that this Court should grant its Motion for Summary Judgment because Plaintiff failed to allege sufficient material facts that dispute Defendant's policy as a pretext for discrimination under either the failure to hire or failure to accommodate claims. Doc. 37 at 13; See Shaver v. Horry Cty. Sch. Dist., 125 F.3d 848 (4th Cir. 1997) (affirming district court's grant of summary judgment where plaintiff failed to offer direct evidence that the defendant's articulated reasons for not promoting her were pretextual).

At the hearing, Plaintiff argued that Defendant's failure to provide information regarding how it arrived at the underlying hearing requirement is evidence of pretext. In support of its argument, Plaintiff cited Hernandez v. Hughes Missiles, 362 F.3d 564 (9th Cir. 2004). In Hernandez, the Ninth Circuit concluded that "the jury could infer from the fact that nobody at [the company] could identify the origin, history, or scope of [an] alleged unwritten policy, that it either did not exist or was not consistently applied." Hernandez, 362 F.3d at 569. The Court finds that the circumstances in Hernandez are distinguishable.

In Hernandez, an employer claimed to have an oral policy which mandated its decision not to re-hire an applicant. Hernandez, 362 F.3d at 568. However, there was also other evidence which discredited the employer's reliance on the oral policy, as the employer provided inconsistent and conflicting explanations for failing to hire the employee. Id. This case is

distinguishable in that Defendant has consistently referred to the minimum hearing standard (i.e. Dowdle's poor hearing) as the basis for denying employment.

While the record does show that the policy applied differently in one respect to leased laborers than it did to direct employees, the Shipyard has provided a legitimate non-discriminatory reason for doing so. The Shipyard is able to work with direct employees because the Shipyard retains the ability to monitor their direct employees for further damage to direct employees' hearing. Further, even under the 2014 standard, someone who has Dowdle's level of hearing loss would not be able to perform shipboard work. Therefore, as there is no evidence of pretext in the record, the Court **FINDS** that Plaintiff has failed to establish a claim for failure to hire under the McDonnell Douglas framework.

### v.   *Failure to Accommodate Claim*

In order to establish a prima facie case for failure to accommodate, a plaintiff must show: "(1) that [he] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [his] disability; (3) that with reasonable accommodation [he] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." Jacobs, 780 F.3d at 579 (4th Cir. 2015) (citing Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013). Dowdle complains that Defendant should have accommodated him by allowing him to use his hearing aids during the hearing test.

Plaintiff points to an e-mail that Dowdle sent to Defendant where Dowdle requested several accommodations. Doc. 31 at 27. First, Dowdle contended that the hearing test was simply a "baseline for liability purposes" and he asked to be allowed to sign a liability waiver and allow him to test with his hearing aids in. Id. Plaintiff contends that such a waiver presents a genuine dispute as to whether a reasonable accommodation would have been possible. Id.

Alternatively, Plaintiff argues that Defendant could have waived the audiometric requirement for Dowdle in light of the fact that a "direct hire who had poor results on a baseline audiogram were brought in for further consultation." Doc. 31 at 27. Or, that Defendant should have engaged in an interactive process with Dowdle prior to denying him the accommodation of using his hearing aids during the hearing test. Doc. 31 at 27-28 (citing Wilson v. Dollar Gen. Corp., 717 F.3d 337, 346 (4th Cir. 2013) (employer has a good faith duty "to engage [with their employees] in an interactive process to identify a reasonable accommodation").

In opposition, Defendant contends: (1) that the lack of accommodation was performed by an outside agency, not Defendant; (2) that Plaintiff's inability to meet the standard of a "qualified individual with disability" is dispositive of the failure to accommodate claim, and (3) that allowing Mr. Dowdle to wear his hearing aid would have been unreasonable in light of the fact that wearing his hearing aid would have "destroy[ed] the very standard—ensuring that workers can perform their job safely based on their unaided hearing—that the test is designed to ensure." Doc. 28 at 23 (citing Allmond v. Akal Sec. Inc., 558 F.3d 1312, 1317-18 (11th Cir. 2009) (rejecting a plaintiff's argument that accommodation of wearing his hearing aid was reasonable where a ban on hearing aids was considered necessary to the safe and effective performance of United States Marshal Service)).

The Court agrees with the latter argument. Defendant has established that evaluating the unaided hearing of a potential employee was essential to its determination of whether an employee could safely perform work at the Shipyard. Thus, as Defendant argues, allowing Dowdle to use his hearing aids would undermine the very purpose of the test.

vi.    *Job-Related Business Necessity of Hearing Standards and Harm Presented by Dowdle's*

*Hearing Impairment*

Because the Court **FINDS** that Plaintiff has failed to establish both its Failure to Hire and Failure to Accommodate claims, there is no need to reach the issue of Defendant's affirmative defenses.

## V.    CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's Motion to Strike, Doc. 29, and **GRANTS** Defendant's Motion for Summary Judgment, Doc. 23.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**.

_____ /s/ _____
Henry Coke Morgan, Jr.
Senior United States District Judge
_____
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
November ____, 2018